**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BARRY A. CHATZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17 CV 4229 |
| | ) | |
| WORLD WIDE WAGERING, INC., et al., | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Horse racing "has an unsavory, or at least a shadowed, reputation, growing out of a long history of fixing, cheating, doping of horses, illegal gambling, and other corrupt practices." *Dimeo v. Griffin*, 943 F.2d 679, 681 (7th Cir. 1991) (en banc). This case does not implicate the integrity of any racing results, but nevertheless involves a series of allegedly corrupt practices engaged in by the directors of two now-defunct horse racing tracks, Balmoral Racing Club, Inc. ("Balmoral") and Maywood Park Trotting Association, Inc. ("Maywood"). In 2006 and 2008, to assist the struggling horse racing industry, the Illinois legislature passed two statutes that ultimately provided for the distribution of roughly $56 million in funds to Balmoral and Maywood. Yet according to the plaintiff—Barry Chatz, the Trustee of the Balmoral Racing Club, Inc. and Maywood Park Trotting Association, Inc. Creditor Trust—much of this money was misappropriated. The Trustee asserts that the directors of Balmoral and Maywood made a series of illegal payments, totaling approximately $20 million, to enrich themselves and others before the tracks ultimately filed for bankruptcy in December 2014. The defendants, including those directors as well as other individuals and related corporate entities, have moved to dismiss eight of the nine counts listed in the Trustee's amended complaint. They have also moved to strike certain allegations in the

complaint under Fed. R. Civ. P. 12(f). The motion to dismiss and the motion to strike are both denied.

## BACKGROUND[1]

Balmoral and Maywood were two Illinois racetracks, formerly located in Crete and Melrose Park, respectively. In the 1980s, both Balmoral and Maywood were purchased by a group of individuals led by William H. Johnston, Jr. ("Billy Johnston"). *See* Am. Compl. for Breaches of Fiduciary Duties, Civil Conspiracy, Fraudulent Transfers, Preferential Transfers, Declaratory J. and Turnover ("Am. Compl.") ¶ 2, 25, ECF No. 24. At the time of the events at issue in this case, the companies that operated the racing tracks were both controlled by a single board of directors.[2] The members of the board included Billy Johnston, his sons John Johnston and William H. Johnston III ("Duke Johnston"), and other associates of the Johnston family, including Steven E. Anton, Phillip Langley, Lester McKeever, and Stephen Swindal. *Id.* ¶¶ 2-3. All of these directors—except for John Johnston, who has previously settled claims against him—are defendants in this action. *See id.* ¶¶ 2-3. Both tracks were owned by a holding company, defendant World Wide Wagering, Inc. ("WWW"), which had no employees and whose sole assets were Balmoral and Maywood. *See id.* ¶ 15.

While horse racing had historically been a popular spectator sport, its popularity declined over time. By 2009, for example, Balmoral and Maywood were each losing approximately $1 million to $2 million each year. *See id.* ¶ 26. Many attribute the decline in racing revenues to the advent and growth of casino gambling. Beginning in 2006, the Illinois General Assembly passed

---

[1] As it must in evaluating a motion to dismiss, the Court accepts the well-pleaded facts in the amended complaint as true and draws all permissible inferences in favor of the Trustee. *Agnew v. NCAA*, 683 F.3d 328, 334 (7th Cir. 2012).

[2] The Court will refer to both the tracks and the companies that operated them as simply "Balmoral" and "Maywood."

two successive statutes that were intended to assist the horse racing industry, which are known as the "Racing Acts." Both laws required four Illinois casinos to pay 3 percent of their revenues into a fund for redistribution to various horse racing tracks in Illinois, including Balmoral and Maywood. *See id.* ¶¶ 27, 34. Each law contained a sunset provision: the first one was enacted in May 2006, remained in effect for two years, and then expired in May 2008. *See id.* ¶¶ 28, 32. The second, which was signed into law in December 2008, effectively extended the provisions of the first one. *See id.* ¶¶ 32, 34.

Upon the passage of the first Racing Act, the affected casinos immediately challenged the validity of the law in court; they would later do the same for the second act after it was enacted. As a result, when the first act took effect, and the casinos began complying with it by paying 3 percent of their revenues, these monies were put into a protest fund. *See id.* ¶ 30. The funds were not available to the racetracks while the litigation proceeded, but were ultimately disbursed in late 2011. By that time, the casinos had paid about $141.8 million under the Racing Acts, and approximately $56 million of that was released to Balmoral and Maywood. *See id.* ¶ 35.

The Racing Acts required that 40 percent of the funds disbursed to the racetracks be used to improve, maintain, market, and operate the racing facilities, while the other 60 percent was to support prize money for races. *Id.* ¶ 41. The board that controlled Balmoral, Maywood, and WWW, however, had other plans. Instead, from 2012 to 2014, the board used the Racing Act funds to make a series of payments, totaling roughly $20 million. These payments took various forms. Some went to the directors themselves, including in the form of directors' fees and increased executive compensation. *See id.* ¶ 95. Other "distributions" were funneled through WWW, and

went to the directors, their families, and related trusts.[3] *See id.* ¶¶ 45, 95. Still other payments went to a separate company named Coast to Coast Food Service, Ltd. ("Coast to Coast"), which provided food and beverage services at the tracks; Coast to Coast was controlled by the same board of directors that oversaw WWW, Balmoral, and Maywood. *See id.* ¶¶ 2, 16. The complaint alleges that the defendants used a variety of mechanisms to direct profits to Coast to Coast and losses to Balmoral and Maywood.

Meanwhile, a separate lawsuit was proceeding against John Johnston, Balmoral, and Maywood. In 2008, Johnston, on behalf of Balmoral and Maywood, had agreed to make a $100,000 contribution to the campaign fund of then-Illinois Governor Rod Blagojevich—in other words, a bribe—to convince Blagojevich to sign the 2008 Racing Act into law.[4] *Id.* ¶¶ 33-34. The casinos' second lawsuit alleged that Balmoral and Maywood had engaged in a conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and brought other claims for civil conspiracy and unjust enrichment. That case proceeded to a jury trial in December 2014. The jury ruled in the casinos' favor and awarded $25,940,000 in damages, which was trebled under RICO to $77,820,000. *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 820 (7th Cir. 2016). The Seventh Circuit would later reduce the damages to $25,940,000, concluding that the casinos were entitled to that amount based on the state-law claims, but not to have the damages trebled under RICO. *Id.*

The judgment on the jury's $77.8 million verdict was entered on December 10, 2014. Am. Compl. ¶ 39. Two weeks later, on December 24, Balmoral and Maywood each filed for bankruptcy

---

[3] Certain recipients of these payments who were not directors are also named as defendants in this case. They include Jane Johnston (Billy Johnston's wife), Heather Johnston (Billy Johnston's daughter), and Michael Anton. All of these individuals were shareholders of WWW.

[4] Blagojevich was convicted of this bribery scheme (among other charges) in a criminal trial. See *United States v. Blagojevich,* 794 F.3d 729, 734 (7th Cir. 2015); Am. Compl. ¶ 34.

under Chapter 11, automatically initiating proceedings in the bankruptcy court in this district. *Id.* In August 2016, the bankruptcy court affirmed a joint liquidating plan. The plan created a creditor trust, named Barry Chatz as Trustee, and preserved several causes of actions for the Trustee. In December 2016, the Trustee filed an adversary complaint in the bankruptcy court. Several groups of defendants moved to dismiss that complaint. In May 2017, in an oral ruling, Bankruptcy Judge Cassling dismissed certain of the Trustee's claims without prejudice and with leave to replead, and dismissed others for lack of subject-matter jurisdiction. Shortly after that ruling, the Trustee filed a motion to withdraw the reference, which this Court granted. *See generally* Order and Statement, ECF No. 20.

After the Court granted the motion to withdraw the reference, the Trustee filed an amended complaint in this Court. The defendants responded by filing a motion to dismiss, asking this Court to dismiss eight of the nine counts listed in the amended complaint under Fed. R. Civ. P. 12(b)(6). In the same motion, the defendants have also asked the Court to strike certain allegations in the complaint under Rule 12(f). That motion is now before this Court.

## DISCUSSION

### I.     Motion to Dismiss

#### A.     Pleading Requirements

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint. *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

The amended complaint and the motion to dismiss in this case follow a familiar pattern. That is, the complaint sets forth nine "counts," and the motion to dismiss responds by addressing eight of the nine counts and attempting to shoot each one down in succession. This approach, while common in litigation, obscures the important difference between *claims* and *counts*. A claim is a set of facts that could entitle the plaintiff to relief under some legal theory. Counts, in contrast, "describe legal theories by which those facts purportedly give rise to liability and damages." *Volling v. Antioch Rescue Squad*, 999 F. Supp. 2d 991, 996 (N.D. Ill. 2013). While pleading in counts is often useful, it is not required unless "doing so would promote clarity" and "each claim [is] founded on a separate transaction or occurrence." Fed. R. Civ. P. 10(b). Indeed, it is a well-established principle that "complaints need not plead legal theories" at all. *Jogi v. Voges*, 480 F.3d 822, 826 (7th Cir. 2007). The complaint must simply provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

This distinction has significant implications. For one thing, because a claim consists of a set of facts, "[o]ne set of facts producing one injury creates one claim for relief, no matter how many laws the deeds violate." *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 292 (7th Cir. 1992). However many counts a plaintiff may plead, they constitute a single claim to the extent that they are premised on the same facts. Another consequence follows from the fact that Rule 12(b)(6) does not allow for "piecemeal dismissals of *parts* of claims." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) (emphasis in original). A Rule 12(b)(6) motion should therefore be granted only when the facts in the complaint, taken as true, do not state a plausible claim under *any* recognized legal theory. *Volling*, 999 F. Supp. 2d at 996; *see also Richards v. Mitcheff*, 696 F.3d 635, 638 (7th Cir. 2012). The Federal Rules of Civil Procedure allow for dismissal of a complaint for failure to state a claim, but they provide no basis "for striking individual legal

theories." *Zidek v. Analgesic Healthcare, Inc.*, No. 13 C 7742, 2014 WL 2566527, at *2 (N.D. Ill. June 6, 2014). Thus, if there is any identifiable legal theory that supports a given claim, that claim survives, and the Court has no need—or authority—to "dismiss" alternative legal theories presented in support of that claim at this stage of the litigation.

### B.     The Trustee's Claims

The Trustee's amended complaint lists nine counts.[5] The defendants have asked the Court to dismiss all of them except for Count VI. As each "count" is properly understood as a legal theory rather than a claim, the Court's first task is to determine how many claims are advanced in the complaint and the claims to which each count applies. As the Court reads the complaint, it puts forward three claims. The first and most important one is that the director defendants made a series of payments from Balmoral and Maywood to themselves and others. These payments took various forms, such as distributions, increased executive compensation, directors' fees, and "pre-paid" expenses to Coast to Coast. But the essence of the claim is that all of these payments, which added up to approximately $20 million, were unlawful. These payments form the basis for Count I, which charges that they represented a breach of the defendants' fiduciary duties as directors of Balmoral and Maywood.

In addition, these payments are also the basis for Counts III, IV, and V. In those three counts, the Trustee invokes 11 U.S.C. § 548, which provides a mechanism for a trustee to "avoid" transfers made by debtors under certain circumstances. The complaint separates the payments out

---

[5] They are as follows: breach of directors' fiduciary duties (Count I); civil conspiracy (Count II); avoidance and recovery of fraudulent transfers to the board (Count III); avoidance and recovery of fraudulent transfers to the Johnston family and trusts (Count IV); avoidance and recovery of fraudulent transfers to affiliated entities (Count V); recovery of improper preference payments (Count VI); unjust enrichment (Count VII); declaratory judgment (Count VIII); and turnover (Count IX). *See* Am. Compl. ¶¶ 89-166.

7

based on who the recipient was: Count III covers the directors; Count IV covers the Johnston family and related trusts; and Count V covers Coast to Coast. All of the transfers that the Trustee seeks to avoid in these counts, however, appear to consist of the same payments made by the director defendants in Count I. *Compare* Am. Compl. ¶ 95, *with* Am. Compl. ¶¶ 114, 125, 131. In short, breach of fiduciary duty and avoidance are simply alternative legal theories that, according to the complaint, allow the Trustee to recover for the same underlying payments.[6]

The Court similarly concludes that the payments are also the basis for Count VII, for unjust enrichment. One might argue, to the contrary, that Count VII is a distinct claim, because the conduct at issue in that count is the act of retaining the payments, not making them. *See id.* ¶ 146 (asserting that the defendants "have each retained improper distributions, executive compensation, directors' fees, 'pre-paid expenses' and fraudulent transfers made to them"). The problem with this approach, however, is that the charge of unjust enrichment presumes that the payments were unlawful. *See id.* ("For them to retain this money, obtained ***in violation of the law***, while Balmoral and Maywood's actual creditors go unpaid, violates fundamental principles of justice, equity, and good conscience.") (emphasis added). That is, the only reason why the defendants' "enrichment" would be "unjust" is if the payments were made in violation of the law. Thus, at its core, Count VII is premised on the same conduct as Counts I, III, IV, and V.

The second claim is that the directors entered into a conspiracy among themselves. This is the essence of Count II, for civil conspiracy. The object of the conspiracy was to make the same $20 million in payments. But the conduct encompassed by the claim is the agreement among the directors to use the Racing Act funds for that purpose. The complaint alleges that the agreement

---

[6] It is not entirely clear whether Count VI, for recovery of improper preference payments, also falls under this category. Because the defendants have not asked the Court to dismiss Count VI, the Court need not address that issue in this opinion.

began as early as May 2009. *See id.* ¶ 102. It further alleges that the director defendants took a series of steps in furtherance of this conspiracy. These included not just making the payments themselves but also misleading regulators at the Illinois Racing Board in order to obscure the fact that the payments had been made. *Id.* ¶ 103. In other words, the ***agreement*** to make the payouts is a distinct claim, separate and independent from the payouts themselves.

Finally, the third claim is embodied in Count VIII and Count IX, which should be read together. Count VIII seeks a declaratory judgment "that WWW, Balmoral, Maywood, [and] Coast to Coast are alter egos of each other, and further that WWW and Coast to Coast are simply alter egos of their shareholders, and in particular the Johnston family and insider shareholders named here." *Id.* ¶ 148. The implication of this, the Trustee says, is that "all of these defendants' assets are subject to administration as assets of Balmoral and Maywood" for the purpose of satisfying creditors' claims against the estates. *Id.* Count IX, in turn, asks that the Court require these defendants "to turn over to the Trustee assets sufficient to pay all of Balmoral and Maywood's creditors' claims in full satisfaction as part of Debtors' bankruptcy estates under 11 U.S.C. § 542." *Id.* ¶ 166.

Section 542(a) "requires parties holding or controlling property of the estate to deliver it to the trustee." *In re Glick*, 568 B.R. 634, 653 (Bankr. N.D. Ill. 2017). As the attorney for the Trustee made clear in the May 2017 hearing in which Judge Cassling issued his oral ruling, the § 542 turnover claim is "not limited to the extent of the fraudulent transfers." Ex. C, May 9, 2017 Hr'g Tr. 37:13-14, ECF No. 1-4. Because, the Trustee asserted, "this was sort of a rat's nest of interrelated entities that didn't follow corporate formalities," the defendants were "responsible for all of the obligations that the debtors have to the creditors, not limited to the amount of the fraudulent transfers." *Id.* at 37:15-21. What the Trustee seeks to do in Count IX, therefore, is to

recover for *all* of Balmoral's and Maywood's obligations, separate from the specific payments that are the subject of the first claim. The alter-ego allegations in Count VIII are not themselves an independent basis for relief, but they provide some of the grounding for the turnover request in Count IX. The logic behind this is that if the defendants are alter egos of Balmoral and Maywood, their property is properly considered the property of the bankruptcy estate.

### C. The Payments

As the previous section illustrates, at the core of the Trustee's complaint are a series of payments made by the director defendants to themselves, their associates, and other related entities. This included more than $7 million in distributions, $5 million in increased executive compensation, $1.4 million in directors' fees, and nearly $3 million in "pre-paid" expenses. Am. Compl. ¶ 95. The first legal theory that the Trustee has put forward as to why these payments were unlawful is that they represented a breach of the directors' fiduciary duties. Because the Trustee has stated a claim on this basis, the Court need not address his alternative legal theories.

As this lawsuit was filed in Illinois, the choice-of-law rules of Illinois apply. Those principles dictate that a suit against a director for breach of fiduciary duty is governed by the law of the state of incorporation. *CDX Liquidating Trust v. Venrock Assocs.*, 640 F.3d 209, 212 (7th Cir. 2011). Here, Balmoral is an Ohio corporation, whereas Maywood is an Illinois corporation. Am. Compl. ¶¶ 13-14. The elements of breach of fiduciary duty are similar under the law of both states. In both cases, the plaintiff must demonstrate that a fiduciary duty existed; that it was breached; and that the breach proximately caused the injury of which the plaintiff is complaining. *See Neade v. Portes*, 193 Ill. 2d 433, 444, 739 N.E.2d 496, 502 (2000) (Illinois law); *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 617 F. Supp. 2d 700, 717 (S.D. Ohio 2009) (Ohio law).

The legal premise of the Trustee's claim is unquestionably sound: directors owe fiduciary duties to the companies they govern, and the misappropriation of funds that are corporate property

for personal uses plainly constitutes a breach of fiduciary duty. The defendants make two principal arguments as to why the Trustee's complaint has not stated a claim for breach of fiduciary duty, neither of which is convincing. The first is that the allegations in the amended complaint that are properly pleaded are equally consistent with lawful conduct. On this point, the defendants rely heavily on the Seventh Circuit's decision in *Brooks v. Ross*, 578 F.3d 574 (7th Cir. 2009). That suit was brought by a plaintiff, Victor Brooks, who was previously a member of the Illinois Prison Review Board. It stemmed from a controversial hearing before that board in which there were allegations of misconduct by Brooks and another individual. The state police conducted an investigation, and defendant Mark Ross served as the case agent. As a result of Ross's investigation, Brooks was indicted by a grand jury and charged with official misconduct and wire fraud; he was later acquitted. Brooks subsequently sued Ross and other defendants under 42 U.S.C. § 1983, alleging, among other things, that they had violated his due process rights. The Seventh Circuit concluded that the defendants' activities as alleged by Brooks—that Ross had produced investigative reports, one of which named Brooks, and that other individuals had either given interviews or assisted with interviews—were insufficient to state a § 1983 due process claim. *Id.* at 580-81. Part of the reason for this, the court stated, was that the "behavior Brooks has alleged that the defendants engaged in is just as consistent with lawful conduct as it is with wrongdoing." *Id.* at 581. It compared Brooks's case to *Twombly*, in which the Supreme Court concluded that the plaintiffs' allegations "of parallel conduct were 'consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.'" *Id.* (quoting *Twombly*, 550 U.S. at 554).

The defendants argue that the same is true in the present case: making the types of payments that are at issue here, they say, is just routine business. It is a common practice, they observe, to

11

pay things like directors' salaries, directors' fees, and distributions to shareholders. *See* Mem. of Law in Supp. of Defs.' Mot to Dismiss Counts I, II, III, IV, V, VII, VIII, and IX of Trustee's Am. Compl. and to Strike Certain Allegations Pursuant to Fed. R. Civ. P. 12(f) ("MTD") 5, ECF No. 32. They contend that the Trustee's assertion that this compensation was excessive is merely editorializing. *See id.* at 7. In short, according to the defendants, the actions taken by the directors were equally consistent with lawful conduct, as in *Brooks* and *Twombly*.

This is not at all persuasive, for two reasons. First, recall that by statute, the Racing Act funds were required to be used on improving, maintaining, and operating the racing facilities, as well as for prize money for races. *See* Am. Compl. ¶ 41. In this context, one could reasonably conclude that it was a breach of the directors' fiduciary duties to do ***anything*** with the money other than to use it as mandated by the Racing Acts, for the long-term health of the tracks. It is decidedly not a normal business practice for a company's directors to ***violate the law*** by taking money that was provided for a specific statutory purpose and instead using it to pay themselves, their families, and their associates.

Second, *Brooks* is easily distinguishable on its facts. The conduct at issue in *Brooks*—such as producing investigative reports, and taking part in or assisting with interviews—is genuinely routine and ordinarily would not raise any inference of impropriety. While one might say the same, in the abstract, about paying out distributions or executive compensation, the potential for abuse in these types of actions is inherently greater. That potential is magnified under certain circumstances, such as when, as here, the company is in questionable financial shape and the scale of the payments runs into the millions of dollars. Against this factual background, it is simply inaccurate to say that the payments were equally consistent with lawful conduct. In this context, and assuming the truth of the allegations in the complaint, it would be an entirely fair conclusion

to say that the directors breached their fiduciary duties by making the $20 million in various payments.

There are numerous examples of specific transfers of funds alleged in the amended complaint that plausibly suggest that the board member defendants breached their fiduciary duties. The distributions of millions of dollars of Racing Act funds to the board member defendants and other insiders by direct transfers funneled through WWW, *see id.* ¶ 45, certainly fall comfortably within this category. This is particularly so given that these distributions were authorized at times when the directors had financial reports projecting that the tracks would not have funds to pay all of their creditors. *Id.* ¶ 48. There is no basis (and the defendants offer none) to characterize the transfer of funds to a holding company with no assets and then on to the defendants themselves as equally consistent with lawful conduct, particularly when the funds were appropriated to the tracks for the specific purposes of improving the racing facilities and providing prize money. These transfers don't even enjoy the coverage of a fig leaf labeled "normal business practice"; as alleged, they represent naked transfers of Racing Act funds to the director defendants and insider shareholders.

As for the payments that the defendants characterize as forms of executive compensation, the defendants argue that there are "no factual allegations to support that the salaries or bonuses were actually out of proportion with the compensation of executives in similarly situated enterprises." MTD 7. This ignores the fact that the complaint alleges that none of the director defendants "did any extra work or provided additional benefits" to the tracks to warrant the compensation increases, as well as the fact that the executive compensation of all of the directors ***increased*** between 2011 and 2014; it doubled or more for most of them. Am. Compl. ¶¶ 59-60. There is no reason to think that any of them were contributing more value to Balmoral or Maywood

in 2014 than they were in 2011.[7] Indeed, the complaint alleges that the director defendants continued to pay Billy Johnston an annual salary ranging from roughly $190,000 to $345,000 when, as Johnston conceded, he had "pretty much" retired more than a decade earlier. *See id.* ¶¶ 59-61.

Further, in arguing that their alleged actions are consistent with lawful behavior, the defendants simply ignore the allegations of fraudulent acts and intent that pepper the complaint. The complaint alleges, for example, that defendant Duke Johnston, along with John Johnston, falsified records provided to state regulators to show that operating expenses had been paid with Racing Act funds when they had actually been paid in the ordinary course of business from operating revenues. *Id.* ¶ 43. Similarly, it alleges that the defendants stopped paying Billy Johnston's annual salary in 2015 as a means of warding off the efforts of the casinos to install a trustee to manage the companies. *Id.* ¶ 61. The complaint further alleges that on the eve of the trial in the RICO lawsuit, the defendants approved the pre-payment of $350,000 in directors' fees for the upcoming year (2015) with the specific intent "to shield this money" from creditors and to take it for themselves. *Id.* ¶ 67. That the defendants ultimately rescinded this pre-payment on the advice of counsel, *see id.* ¶ 68, only highlights the plausible inference that the transaction was animated not by concerns to protect the tracks but rather to milk them for funds before they collapsed.

These allegations—along with the others described earlier in this section—are more than sufficient to plausibly raise the prospect of self-dealing, particularly in the context of Balmoral's and Maywood's strained financial condition.

---

[7] The defendants argue that the increases in executive compensation from 2011 to 2012 merely represented the restoration of pay cuts made in 2011. *See* MTD 9. As this argument relies on factual allegations outside the complaint, the Court does not consider it.

The defendants' second argument is that the complaint does not identify which state law applies to the claims for breach of fiduciary duty. This is erroneous on multiple levels. For one, the complaint **does** in fact do exactly what the defendants say it does not: it alleges that in their capacity as directors of Balmoral, the director defendants were responsible under Ohio law, and that in their capacity as directors of Maywood, they were responsible under Illinois law. *See* Am. Compl. ¶¶ 92-93. More fundamentally, as discussed above, *see supra* at 5-7, a complaint need not plead legal theories at all. If a plaintiff is not required to plead legal theories to begin with, it necessarily follows that he is under no obligation to identify what state law applies to any legal theory he might or might not put forward. *Cf. Landmark Document Servs., LLC v. Omega Litig. Sols., LLC*, No. 05 C 7300, 2006 WL 2861098, at *2 (N.D. Ill. Sept. 29, 2006) ("Defendants offer no rule, statute, or case law obligating Plaintiff to plead choice of law in the complaint and indeed do not even attempt to explain how this alleged deficiency is relevant to the legal sufficiency of Plaintiff's claims.").

In summary, the director defendants do not contest that they owed fiduciary duties as directors of Balmoral and Maywood. The Trustee has plausibly alleged that they breached those duties by paying out $20 million in Racing Act funds to themselves, other Johnston family members, and other related entities, even as they knew the tracks were in questionable financial shape. The payments caused financial injury to the tracks in the form of lost income, which, one could infer, was at least a contributing factor in leading to their ultimate bankruptcy. The Court therefore concludes that the Trustee has stated a claim that the various payments were unlawful based on a theory of breach of fiduciary duty. Accordingly, that claim survives, and it is

unnecessary to address the merits of the defendants' other challenges to the Trustee's alternative theories of avoidance[8] and unjust enrichment.

### D.    Civil Conspiracy

Under Illinois law, there are three elements of a civil conspiracy: "(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 209 Ill. 2d 302, 317, 807 N.E.2d 461, 470 (2004). In the present case, the defendants do not even really contest that the Trustee has adequately alleged the elements of civil conspiracy. Instead, their sole argument as to why this claim should be dismissed is that, they say, under Illinois law "civil conspiracy is not an independent cause of action, and only becomes actionable if the underlying conduct is independently tortious." MTD 12. Thus, if "the underlying claims in an action are dismissed, the civil conspiracy claim must also be dismissed." *Id.* The Trustee, for his part, rejects this conclusion. *See* Trustee's Resp. to Defs.' Mot. to Dismiss Counts I, II, III, IV, V, VII, VIII, and IX of Trustee's

---

[8] While the Court need not, and does not, address the merits of the avoidance theory, it bears noting that, in their motion to dismiss, the defendants also object to the amended complaint on the basis of Rule 9(b), which requires that in alleging fraud, "a party must state with particularity the circumstances constituting fraud." This argument is specifically related to Counts III, IV, and V, which alleges that the transfers in question were fraudulent. The defendants' particular objection is that the complaint does not adequately "inform each defendant of the nature of his or her alleged participation in the fraud." MTD 15 (quoting *PharMerica Chicago, Inc. v. Meisels*, 772 F. Supp. 2d 938, 955 (N.D. Ill. 2011)). The Court rejects this argument. The complaint satisfies the oft-repeated requirement that it must provide the "who, what, when, where, and how" of the fraud. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). Virtually all of the allegedly fraudulent actions described in the complaint were taken by the combined board that oversaw Balmoral and Maywood. The relevant conduct of the individual directors was to vote for those plans. Whether the defendants actually committed fraud remains to be seen, but the complaint has sufficiently alleged fraud so as to satisfy Rule 9(b).

Compl. and to Strike Certain Allegations Pursuant to Fed. R. Civ. P. 12(f) ("Response") 14-16, ECF No. 35.

It is not necessary to resolve this dispute at this stage in the litigation. As the Court has already concluded, the Trustee has adequately pleaded his allegations regarding breach of fiduciary duty. The Trustee has stated a claim that the director defendants breached their fiduciary duties by making the roughly $20 million in payouts. In other words, the Trustee has adequately alleged that the underlying conduct was independently tortious. As a result, even if the defendants were correct as a general matter that civil conspiracy cannot serve as a standalone cause of action in Illinois, this would not serve as an obstacle to the Trustee's claim in this case. The amended complaint plausibly alleges that the director defendants combined to accomplish the independently unlawful purpose of enriching themselves and their associates by misappropriating Racing Act funds. It further alleges that the defendants committed multiple overt acts in furtherance of this conspiracy, including casting those self-dealing votes to make the payments and misleading regulators at the Illinois Racing Board. *See* Am. Compl. ¶ 103. Based on these allegations, the Trustee's civil conspiracy claim may go forward.

### E.     Turnover

11 U.S.C. § 542(a) provides that any entity "in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease . . . shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." In other words, the statute requires any entity in possession of property that is the property of the estate to deliver it to the trustee. When property has not been delivered, a trustee may sue under § 542(a) to compel its turnover. *Glick*, 568 B.R. at 668.

The defendants argue that a turnover action in this case is inappropriate "because the Tracks relinquished control of the subject property prior to the Petition Date." MTD 26. Accordingly, they

say, "the proper way for the Trustee to recover the property is through a fraudulent transfer action, rather than a turnover action." *Id.* To the extent that Count IX seeks to recover specific payments made to the defendants, they are correct. As the Seventh Circuit has made clear, a § 542 turnover action "generally cannot substitute for a fraudulent-transfer action. In other words, the representative of a bankruptcy estate cannot use a Section 542 turnover action to regain the debtor's interest in property when he transferred it to someone else before filing for bankruptcy." *In re Veluchamy*, 879 F.3d 808, 816 (7th Cir. 2018). In the present case, all of the relevant payments appear to have been made prior to Balmoral's and Maywood's bankruptcy filings on December 24, 2014. The Trustee therefore cannot recover them in a turnover action.

This does not, however, appear to be the basis for the turnover request. Instead, as discussed above, *see supra* at 9-10, the turnover request is based primarily on the alter-ego theory that is spelled out in Count VIII. In general, a corporation "is a legal entity that exists separately and distinctly from its shareholders, officers, and directors, who generally are not liable for the corporation's debts." *In re Rest. Dev. Grp., Inc.*, 394 B.R. 171, 183 (Bankr. N.D. Ill. 2008). A court may disregard that separate legal existence "and pierce the veil of limited liability where the corporation is merely the alter ego or business conduit of another person or entity." *Id.* Here, the Trustee argues that "WWW, Balmoral, Maywood, [and] Coast to Coast are alter egos of each other, and further that WWW and Coast to Coast are simply alter egos of their shareholders, and in particular the Johnston family and insider shareholders named here." Am. Compl. ¶ 148. What the Trustee seeks to do, in effect, is to treat the assets of all these defendants—independent of any specific transfers or payments—as the assets of the bankruptcy estate, under the theory that the defendants are alter egos of Balmoral and Maywood. *Cf. Glick*, 568 B.R. at 652 ("Gierum is employing his veil-piercing theories partly to set up turnover claims that will force the assets of

the alter egos into Glick's bankruptcy estate."). This Court does not read *Veluchamy* to bar this type of action. At the same time, the Court acknowledges that this is an area where the governing law is not entirely clear. For the sake of evaluating the motion to dismiss, the Court will assume that the Trustee may seek a turnover on this basis; this does not prevent the defendants from reasserting this challenge at any later stage in the litigation.

Attempts to pierce the corporate veil are "governed by the law of the state of incorporation." *Stromberg Metal Works, Inc. v. Press Mech., Inc.*, 77 F.3d 928, 933 (7th Cir. 1996). In the present case, the companies involved are organized under the laws of Illinois (Maywood and Coast to Coast), Ohio (Balmoral), and Delaware (WWW). The various tests that these three states employ to determine when the corporate veil may be pierced have some differences between them, but are broadly similar. In Illinois, courts use a two-part test: "(1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances must exist such that adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences." *Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491, 500, 840 N.E.2d 767, 776 (2005).[9] Courts look at a variety of factors as part of this analysis, including:

> inadequate capitalization; failure to issue stock; failure to observe corporate formalities; nonpayment of dividends; insolvency of the debtor corporation; nonfunctioning of the other officers or directors;

---

[9] For comparison, Ohio law requires that, in order to pierce the corporate veil, "(1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud, an illegal act, or a similarly unlawful conduct or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong." *Meinert Plumbing v. Warner Indus., Inc.*, 90 N.E.3d 966, 976 (Ohio Ct. App. 2017). Under Delaware law, to "state a 'veil-piercing claim,' the plaintiff must plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors and creditors." *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003).

> absence of corporate records; commingling of funds; diversion of
> assets from the corporation by or to a shareholder; failure to
> maintain arm's length relationships among related entities; and
> whether the corporation is a mere facade for the operation of the
> dominant shareholders.

*Jacobson v. Buffalo Rock Shooters Supply, Inc.*, 278 Ill. App. 3d 1084, 1088, 664 N.E.2d 328, 331

(1996).

In his May 2017 oral ruling, Judge Cassling rejected "the defendants' assertions that the

trustee has not adequately pled claims for alter ego and piercing the corporate veil." May 9, 2017

Hr'g Tr. at 17:11-14. He concluded that "[t]he Complaint contains enough factual detail to give

the defendants fair notice of the basis for relief sought, and the allegations plausibly suggest that

the trustee has a right to relief." *Id.* at 17:14-18. The Court agrees with this assessment. To begin

with the corporate entities, the amended complaint pleads sufficient facts to allow one to

reasonably conclude that WWW, Balmoral, Maywood, and Coast to Coast were alter egos of each

other. According to the complaint, a single board of directors oversaw and controlled all of these

entities. Am. Compl. ¶ 2. These entities had no separate corporate offices. *Id.* ¶ 83. No separate

board meetings were held for each of them; instead, meetings were held by the single board for all

of them. *Id.* ¶ 84. Only minimal corporate records were kept that identified any degree of

separation between the various corporate entities. *Id.* ¶ 156. WWW had no employees at all, and

its only purpose was to serve as a conduit for transfers of money. *Id.* ¶ 15. The other three

companies shared overlapping officers and employees without regard to corporate form. *Id.* ¶ 85.

The amended complaint also contains allegations about more specific ways in which the

various corporate entities were used. For example, it alleges that the corporate entities had an

arrangement whereby profits were allocated to Coast to Coast whereas losses were allocated to

Balmoral and Maywood. *Id.* ¶ 154. This led to a distribution of $1.25 million in profits to Coast to

Coast shareholders that should have gone to Balmoral and Maywood. *Id.* The complaint further

alleges that the director defendants adopted a so-called "Asset Protection Plan" by which assets were moved away from Balmoral and Maywood in anticipation of a possible large judgment in the RICO lawsuit. *Id.* ¶ 75. As part of this plan, Balmoral and Maywood made various "pre-payments" of expenses, agreed to at a board meeting on November 24, 2014, including one such payment of $412,475 to Coast to Coast. *Id.* In short, one could reasonably conclude, on the basis of all the complaint's well-pleaded allegations, that there was such a unity of interest among the various corporate entities that they did not have separate legal personalities. One could also conclude that to adhere to the fiction of legal separateness would sanction fraud, promote injustice, or serve as a sham, causing injury by draining Balmoral and Maywood of funds that should have belonged to them and otherwise would have been available to repay creditors.

The defendants do not spend a lot of energy challenging the plausibility of the veil-piercing theory as to WWW, which existed (as alleged) solely to transfer funds between the tracks and the Johnston family and its acolytes. They do, however, challenge the propriety of piercing the veil as to Coast to Coast, which was not a shareholder of either WWW or the two tracks. *See* MTD 23-24. As the defendants acknowledge, however, and as the cases they cite indicate, "it is possible for a nonshareholder to be found personally liable under a veil-piercing theory." *Id.* at 23; *see also Buckley v. Abuzir*, 2014 IL App (1st) 130469 ¶ 29, 8 N.E.3d 1166, 1176-77 ("[T]he weight of authority supports the conclusion that lack of shareholder status—and, indeed, lack of status as an officer, director, or employee—does not preclude veil-piercing."). What is required, as the more general formulation of the alter-ego test quoted above shows, is simply that there must be such unity of interest and ownership that the separate legal personalities of the two entities do not exist. As the previous several paragraphs demonstrate, the complaint plausibly suggests that this is the case with respect to all of the corporate entities in this case—including Coast to Coast. As the

Seventh Circuit has put it, "the corporate form may be disregarded where one corporation is so organized and controlled and its affairs so conducted that it is a mere instrumentality or adjunct of another corporation." *Cont'l Cas. Co. v. Symons*, 817 F.3d 979, 993 (7th Cir. 2016) (citation and internal quotation marks omitted). That description fits the Trustee's allegations as to Coast to Coast as hand in glove.

Further, the Court has no difficulty concluding, based on the allegations of the complaint, that piercing the veil of WWW and Coast to Coast to reach the individuals associated with them is plausibly warranted as to the director defendants. As discussed above, the complaint amply alleges that they orchestrated a scheme to transfer millions of dollars of Racing Act funds to themselves. Where affiliated corporations disregard their legal distinctiveness and operate through intermingled "business transactions, functions, property, employees, funds, [and] records," *id.* at 996, it is appropriate to treat them as a single enterprise and to conclude that the enterprise exists as the alter ego of those responsible for disregarding the legal distinctions between its component corporations. That is precisely what happened in *Symons*, where the Seventh Circuit affirmed a judgment entered against an insurance business and the father and sons who were its principals and controlling shareholders. The business consisted of a number of related corporate entities, all of which were "controlled as one enterprise by the Symons family," and whose operations were run "for the benefit of the Goran empire." *Id.* The Seventh Circuit approved of the district court's conclusion that the individual family members and the corporate entities were all alter egos of one another. *Id.* at 993-97; *see also IGF Ins. Co. v. Cont'l Cas. Co.*, No. 1:01-cv-799-RLY-KPF, 2009 WL 4016608, at *63 (S.D. Ind. Oct. 19, 2009) ("[T]he court finds that CCC has proven, by a preponderance of the evidence, that Alan Symons, Doug Symons, Gordon Symons, SIG, Goran, Granite Re, IGF, IGFH, Pafco, and Superior were all alter egos of one another."). Here, the director

22

defendants took most of the relevant actions described in the complaint collectively, acting as a single board. As alleged, they are responsible for both the conduct of the tracks, WWW, and Coast to Coast, as well as for the failure to respect corporate formalities and the legal distinctions among all of these organizations. This is enough to plausibly allege that the directors were alter egos of WWW and Coast to Coast.

A stronger argument against veil-piercing might be made with respect to the non-director defendants (Jane Johnston, Heather Johnston, and Michael Anton). Notably, these defendants did not play a significant role in directing or controlling the actions of the tracks or the corporations. The case for veil-piercing as to these defendants rests primarily on the allegation that they received distributions from WWW and Coast to Coast. In addition, the Trustee alleges that all three of these individuals "received this money after being told, including at shareholder meetings, that they were receiving Racing Act funds money and further that Balmoral and Maywood were losing money annually and that both entities were in a precarious financial position, facing insolvency." Am. Compl. ¶ 51. In this light, the Trustee argues, "the shareholders are properly found alter-egos where they acquiesced to corporate formalities not being followed and received millions of dollars, even after being told at shareholders' meetings about the Tracks' financial position and that Racing Acts funds were funding these transactions." Response 25. *Wachovia Secs., LLC v. Banco Panamerico, Inc.*, 674 F.3d 743 (7th Cir. 2012), on which the Trustee relies, supports this point. In that case, the Seventh Circuit affirmed the district court's decision to pierce the veil as to two shareholders where the district court had also found that they were nonfunctioning officers. *See id.* at 755, 757. The Seventh Circuit wrote that the "culpability shared by Jahelka and Nichols is immaterial in determining whether the shareholders had a unity of interest and ownership. The

shareholders, by failing to act as they would in a truly independent corporation, enabled the fraud or injustice." *Id.* at 755.

In *Symons*, the Seventh Circuit did, however, acknowledge that concern about the effect of veil piercing on "innocent third-party shareholders" might warrant consideration in assessing the propriety of veil piercing in the context of a publicly traded company, where many shareholders would undoubtedly have no knowledge of the conduct making the company susceptible to veil piercing. 817 F.3d at 996. The court of appeals nevertheless affirmed the district court's decision to pierce the veil to hold the principal family shareholders liable for corporate debt on an alter-ego theory. *Id.* The allegations of this complaint warrant a similar conclusion: where the alleged looting of corporate assets went to the benefit of not only the controlling principals but also to a close circle of family and associates, concern for "innocent third-party shareholders" is misplaced. This is particularly so in view of the Trustee's allegations that all of the non-director individual defendants were told, prior to accepting the distributions, ***both*** that Balmoral and Maywood were facing insolvency ***and*** that they were being paid with Racing Act funds—meaning that they knew or should have had reason to know that the payments were unlawful. In short, while the non-director individual defendants represent the closest call, the Court concludes that at this stage the Trustee has stated a plausible claim that they were also alter egos of WWW and Coast to Coast.

Finally, the Court also rejects the defendants' contention that the Trustee engaged in improper group pleading. An "allegation directed at multiple defendants can be adequate to plead personal involvement." *Rivera v. Lake County*, 974 F. Supp. 2d 1179, 1194 (N.D. Ill. 2013). A complaint will not fail on the grounds of "group pleading" when it "refers adequately to specific Defendants or subgroups of Defendants when possible, and includes enough factual content to give those Defendants fair notice of the claims against them." *Id.* at 1195. The fact that the

24

Trustee's amended complaint often groups the conduct of different individual defendants together is not an appropriate basis for dismissal under the circumstances of this case. For the board defendants, as noted above, *see supra* at 16 n.8, most of the relevant actions they took were done through the board itself. To allege that the board took an action is to allege that the individual directors did so as well, in their capacity as directors. And as for the non-director defendants, the complaint alleges that all of them—meaning each of them as individuals—received distributions after being told both that Balmoral and Maywood were facing insolvency and that they were (unlawfully) being paid with Racing Act funds. *See* Am. Compl. ¶ 51. For each subgroup of defendants, this is sufficient to give notice of the claims against them.[10] The Trustee's turnover claim accordingly survives.

## II. Motion to Strike

Finally, the defendants have asked the Court to strike certain allegations made in the amended complaint. Federal Rule of Civil Procedure 12(f) provides that a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." A motion to strike under this rule "will not be granted unless the statement in question

---

[10] It is also worth noting in this regard that the Trustee named only 19 of WWW's 57 shareholders as defendants in this case. *See* MTD 19. (This calculation appears to count some defendants multiple times, for those who are named both in an individual capacity and as a trustee, but this does not change the legal analysis.) The defendants' argument that the remaining shareholders are necessary parties under Rule 19 has no merit. *See id.* at 25. The defendants contend that the unnamed shareholders are indispensable parties to this action because "the Trustee seeks a finding that the Tracks and WWW, are alter egos of each other, and further that WWW is the alter ego of its shareholders." *Id.* This misreads the complaint. While the complaint is not entirely clear on this point, the most natural reading of the relevant portion—particularly when it is interpreted in light of the rest of the complaint—is that it asks for a declaratory judgment that the companies are alter egos of the ***named*** shareholders. *See* Am. Compl. ¶ 148. In this context, the absence of the unnamed shareholders is not a barrier to the granting of relief, and the unnamed shareholders have no interest in the action that would require them to be joined under Rule 19.

bears no possible relation to the dispute, might cause unfair prejudice to a party, or could confuse

the issues." *Goede v. Mare Rest.*, No. 95 C 5238, 1995 WL 769766, at *5 (N.D. Ill. Dec. 29, 1995).

The portions of the complaint that the defendants would like the Court to strike concern

two would-be transactions. In the first, the amended complaint alleges that in November 2014, the

director defendants voted to "pre-pay" themselves $350,000 in directors' fees for 2015,

representing $50,000 for each of them. *See* Am. Compl. ¶ 67. When Balmoral and Maywood's

bankruptcy counsel learned of these transfers, they directed that the board members return these

payments, which they apparently did. *Id.* ¶ 68. In the second incident, which took place the

following month, the board allegedly approved a complicated transaction in which the board voted

to give one of the trusts involved in this case the option to buy all of Balmoral's and Maywood's

assets for far less than they were then valued. *See id.* ¶ 76. Five days later, again at the insistence

of bankruptcy counsel, the board voted to rescind this transaction. *Id.* ¶ 77. According to the

defendants, the inclusion of these allegations in the complaint is improper because the two

transactions never went forward. The defendants argue that the allegations should be stricken on

the grounds that they are irrelevant to the legal issues at hand and that they only serve to prejudice

the defendants. *See* MTD 26-27.

The defendants' motion must be rejected. The allegations related to these two transactions

are relevant to the Trustee's case. In particular, as the Trustee correctly points out, in Counts III,

IV, and V, the Trustee seeks to avoid a series of allegedly fraudulent transfers under 11 U.S.C.

§ 548. To invoke this mechanism, a plaintiff must demonstrate that there was either constructive

fraud or actual fraud; here, the Trustee has pleaded both in the alternative. For actual fraud, that

requires the Trustee to show that a transfer was made "with actual intent to hinder, delay, or

defraud any entity to which the debtor was or became, on or after the date that such transfer was

made or such obligation was incurred, indebted." 11 U.S.C. § 548(a)(1)(A). In other words, the defendants' ***intent*** in making the other transfers that the Trustee is seeking to avoid is at issue in this case. The allegations regarding these two transactions are relevant to that issue. While these transactions may have been unwound or rescinded—apparently at the urging of counsel—at the very least, they are relevant to the subject of the director defendants' intent around the time that they were making the other decisions in question. This is enough to satisfy the very low bar of bearing some "possible relation" to the dispute under Rule 12(f). The Court also rejects the suggestion that the inclusion of these allegations in the complaint serves to confuse the issues or prejudice the defendants. Any prospective jury would be more than capable of understanding the difference between a transfer of money that was later rescinded and one that was not.

Perhaps recognizing the weakness of their case regarding the motion to strike, the defendants do not even address this issue in their reply brief. The Court concludes that the contested allegations are both relevant to this dispute and that they do not serve to confuse the issues or prejudice the defendants. The motion to strike is therefore denied.

*     *     *

Because the Trustee's amended complaint satisfies the Rule 12(b)(6) standard with respect to all of his claims, the defendants' motion to dismiss is denied. The Court also denies the defendants' motion to strike under Rule 12(f).

Dated: September 11, 2019

_____
John J. Tharp, Jr.
United States District Judge